1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **EASTERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  FRANCIS J. RAGASA, | ) Case No.: 1:15-cv-00471 - JLT |
| 12         Plaintiff, | ) ORDER DIRECTING ENTRY OF JUDGMENT IN |
| 13     v. | ) FAVOR OF DEFENDANT CAROLYN COLVIN, ) ACTING COMMISSIONER OF SOCIAL |
| 14  CAROLYN W. COLVIN, | ) SECURITY AND AGAINST FRANCIS J. ) RAGASA |
| 15  Acting Commissioner of Social Security, | ) |
| 16         Defendant. | ) (Doc. 15) |

17          Francis Ragasa asserts he is entitled to disability insurance benefits and supplemental security

18   income under Titles II and XVI of the Social Security Act.  Plaintiff argues the administrative law

19   judge erred in evaluating the record and seeks judicial review of the decision to deny his applications

20   for benefits.  Because the ALJ properly considered the Employability Study prepared by a

21   chiropractor, the decision is **AFFIRMED**.

22                          **PROCEDURAL HISTORY**

23          Plaintiff filed his applications for benefits on February 29, 2012, alleging disability beginning

24   on June 5, 2006. (Doc. 10-6 at 2, 12.)  The Social Security Administration denied Plaintiff's

25   applications at both the initial level and upon reconsideration. (*See generally* Doc. 10-4.)  After

26   requesting a hearing, Plaintiff testified before an ALJ on June 24, 2014. The ALJ determined Plaintiff

27   was not disabled and issued an order denying benefits on August 15, 2014. (Doc. 10-3 at 13-23.)  When

28   the Appeals Council denied Plaintiff's request for review of the decision on January 22, 2015, the

1    ALJ's determination became the final decision of the Commissioner of Social Security

2    ("Commissioner").

3                                **STANDARD OF REVIEW**

4            District courts have a limited scope of judicial review for disability claims after a decision by

5    the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact,

6    such as whether a claimant was disabled, the Court must determine whether the Commissioner's

7    decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's

8    determination that the claimant is not disabled must be upheld by the Court if the proper legal

9    standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of*

10   *Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

11           Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a

12   reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

13   389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole

14   must be considered, because "[t]he court must consider both evidence that supports and evidence that

15   detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

16                                **DISABILITY BENEFITS**

17           To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to

18   engage in substantial gainful activity due to a medically determinable physical or mental impairment

19   that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C.

20   § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

21           his physical or mental impairment or impairments are of such severity that he is not only
             unable to do his previous work, but cannot, considering his age, education, and work
22           experience, engage in any other kind of substantial gainful work which exists in the
             national economy, regardless of whether such work exists in the immediate area in which
23           he lives, or whether a specific job vacancy exists for him, or whether he would be hired if
             he applied for work.
24

25   42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v.*

26   *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

27   the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

28   gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

                                            2

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

**A.      Relevant Medical Opinions**

On July 28, 2006, the plaintiff underwent an MRI which revealed "Spondylolisthesis and spondylolysis at L5-S1 with broad-based disk bulge and severe bilateral foraminal narrowing particularly on the left.  The disk appears to be intact."  (Doc. 10-8 at 5)

The next month, on August 4, 2006, Dr. Ronald Whitmore, evaluated the plaintiff and noted that though the plaintiff reported being in "constant" pain, he reported that the "[p]hysical therapy and walking are helping."  (Doc. 10-9 at 28)  Dr. Whitmore concluded, "[P]atient not wanting surgery. Given his improving symtosm [sic] and abscence [sic] of neuro tension signs, he probably does not need surgery. However, . . . [Epidural Spinal Injection] may speed his return to his usual activities."  Id. In December 2006—two weeks after the spinal injection—the plaintiff returned to see Dr. Whitmore and reported that, "he has no pain in the calf any more.  He still has pain in his left buttocks.  No meds."  Id. at 54.  Dr. Whitmore observed that the plaintiff's range of motion was "almost full with no pain."  Id.  Dr. Whitmore found that the plaintiff could return to work, though with modified duty. Id

On December 27, 2006, Dr. Whitmore saw the plaintiff and noted that he had suffered a return of the pain in his lower back and left leg.  (Doc. 10-9 at 58)  Dr. Whitmore referred the plaintiff to Dr. Bybee for a neurosurgical evaluation "and probable surgery."  Id.  Dr. Whitmore noted, "The patient has had conservative treatment [sic] for 6 months and two ESI's with only short term results.  The mri scan and positive slr support the need for probable surgery.  Patient is referred to Dr. Bybee for consult. If Dr. Bybee agrees with me, then the patient should proceed with surgery." Id. Dr. Whitmore found

3

that the plaintiff could return to work on modified duty.  Id

On February 6, 2007, the plaintiff was examined by Dr. Bybee. Id. at 12.  He reported complaints of low back pain that radiated into his left leg and reported he had felt this pain for six months.  Id.  He reported that his pain was aggravated by standing.  Id.  He reported that he had engaged in physical therapy, medication and two lumbar epidural steroid injections.  Id.  Dr. Bybee noted that he had 90 degree flexion of this lumbar without difficulty and "10 degrees pain limited."  Id. Dr. Bybee noted that the plaintiff had "some difficulty" heel walking and toe walking on the right foot but that single leg raise was negative.  Id.  Dr. Bybee "recommended that the patient consider surgical intervention" but the plaintiff indicated he wanted to think about it and call Dr. Bybee when he made a decision. Id. at 10.

The plaintiff underwent an Employability Screening Study by chiropractor, Shane Dreher, on September 21, 2007.  (Doc. 10-10 at 42-51)  Dr. Dreher noted that the plaintiff's chief complaint was "Moderate-severe" "low back pain" that was unchanged and was constant.  Id. at 43.  The plaintiff reported the pain was exacerbated by bending, exercise, lifting, reaching and working and was relieved by heat, lying down, over-the-counter medication, prescription medication and resting.  Id.

Dr. Dreher noted the plaintiff had a moderate-to-severe restriction in his cervical left lateral flexion and right rotation, a moderate restriction in his cervical extension and a mild restriction in his cervical right lateral flexion and left rotation.  (Doc. 10-10 at 45)  In addition, he had a severe restriction in his lumbar left lateral bending, a moderate restriction in his lumbar right lateral bending and a mild restriction in his lumbar flexion and extension.  Id.  Dr. Dreher determined the plaintiff had restrictions on his ability to lift and carry and push and pull.  Id. at 48.  Also, he could occasionally— though at the "low end of occasional"—climb stairs, toe and heel walk, crouch, crawl, squat, bend and reach.  Id. at 48-49.  He could sit, stand and walk occasionally.  Id. at 49.

Dr. Dreher found the plaintiff suffered a decreased range of motion in his cervical and lumbar spines and decreased lifting and carrying ability.  (Doc. 10-10 at 51) Dr. Dreher concluded that he had a score of 11 which indicated he needed "Level II screening and further assessment by a Vocational Expert."  Id.

The next month, on October 8, 2007, the plaintiff again saw Dr. Yang.  (Doc. 10-12 at 8-11)  At

that time, the plaintiff reported the medications allowed him to "continue daily activities at a tolerable state . . . [b]reakthrough pain continues however . . ." Id. at 8. He again reported that the modalities of treatment he had undergone "are giving perceptible relief" but [h]e remains unable to resume the previous tasks he was capable of performing prior to the injury." Id. The plaintiff continued to desire to "continue with a rehabilitative program with the understanding the ultimate goal is to restore maximal recovery of function." Id. at 9. Dr. Yang continued to recommend conservative treatment. Id.

Dr. Yang saw the plaintiff on February 4, 2008. (Doc. 10-10 at 22-25) He reported that he was continuing to have problems with his back, "The current medical regimen has been providing perceptible relief . . . [and] He does not describe any significant adverse reaction." Id. at 22. Despite this, the plaintiff reported to be unable to "perform some tasks he was capable of doing prior to the injury." Id. The plaintiff expressed that he wished to continue in a rehabilitative program but that he was suffering bouts or insomnia and was feeling depressed. Id. at 23. Dr. Yang noted "hypertonicity and spasm with associated tenderness" and "significant restriction of lumbar flexion, especially with lumbar extension maneuver." Id. Dr. Yang recommended continuing in the conservative course of treatment, including chiropractic care and recommended he be evaluated by a psychologist. Id. at 23-25.

On March 1, 2008, Dr. David Easley issued his report on the qualified medical evaluation performed in connection with his worker's compensation claim. (Doc. 10-10 at 3-13) The plaintiff reported he suffered from low back pain, which he described as a "constant, dull aching sensation" and rated the pain as a four on a scale of ten. Id. at 9. He reported his pain worsened with standing for more than 15 to 20 minutes, sitting for 20 minutes or bending, twisting or lifting more than 25 pounds which, he reported caused his pain to increase to a nine on a scale of ten. Id. The doctor noted that the plaintiff had pain in his lumbosacral junction with palpation though there was no tenderness of the sciatic notch and there was no evidence of muscle spasm. Id. The plaintiff had 90 degrees flexion and pain upon extension beyond ten degrees. Id. Also bending to the left 15 degrees caused him pain to the side toward which he bent. Id. He had normal heel-toe gait, normal reflexes in his legs, and could attain 70 degrees single leg raise on both legs. Id. His halluces longus were "bilaterally symmetrical and full." Id. at 10. The doctor's impressions were: chronic lumbosacral strain with radiculopathy,

1   spondylolisthesis, nonindustrial and exogenous obesity.  Id. at 10.The doctor concluded that absent

2   further medical intervention, the plaintiff was permanent and stationary and determined he suffered an

3   "8% Whole Person Impairment." Id. at 12.  Nevertheless, Dr. Easley anticipated the plaintiff may need

4   additional diagnostic testing and surgical fusion and discectomy of the lumbar spine at the L5-S1 level.

5   Id.

6          On April 2, 2008, the plaintiff's primary care, workers compensation physician, chiropractor

7   Richard Chau, submitted a progress report in which he noted that the plaintiff complained of "Frequent

8   and moderate low back pain that radiates into the left leg and intermittent and moderate neck pain that

9   radiates into the left arm." (Doc. 10-14 at 24)  He requested authorization for chiropractic care one

10  time per week for two weeks and a referral to Dr. Yang for evaluation and pain medication.  Id.

11         On April 5, 2008, the plaintiff saw Dr. Christopher Chen.  (Doc. 10-10 at 20)  He reported to

12  Dr. Chen that he had been taking Advil for pain and that the epidural injections he had received

13  relieved his pain only for two weeks.  Id. The doctor noted, "Bilateral tenderness and spasms of the L3-

14  5 paraspinous muscles" and that he had decreased range of motion of his lumbar spine.  Id.  He had

15  only 70 degrees of flexion and ten degrees of extension.  Id.  He had bilateral lateral bending at 20

16  degrees and rotation at 30 degrees.  Id.  He had weakness in the left hallucis longis.  Id.  Dr. Chen

17  concluded that the plaintiff needed pain, anti-inflammatory and anti-spasm medications.  Id.

18         On June 11, 2008, Dr. Chau again provided a progress report.  (Doc. 10-14 at 23)  He noted the

19  same subjective report as in his April report and requested authorization for chiropractic care one time

20  per month for two months and for a referral to acupuncture three times per week for two weeks.  Id.

21  On September 17, 2008, Dr. Chau reported the same subjective complaints as in April and June and

22  requested the same authorizations as in June.  Id at 22. A few weeks later, on September 30, 2008, Dr.

23  Chau reported the same subjective complaints but this time requested authorization for chiropractic

24  care twice per month for six months and to refer the plaintiff for evaluations and pain medication to Dr.

25  Chen.  Id. at 21.  On October 31, 2008, Dr. Chau reported the plaintiff complained of "Intermittent to

26  frequent and moderate low back pain that radiates to the left leg made worse with prolonged standing

27  and sitting.  He reports leg weakness in the left side." Id. at 20.  He sought the same authorizations as

28  before.  Id.

1      Dr. Chen again saw the plaintiff on November 5, 2008.  (Doc. 10-16 at 37)  Dr. Chen provided

2  him anti-spasm and anti-inflammatory/pain medications and sleep medication.  Id.   Dr. Chen restricted

3  him to lifting no more than 15 pounds and to avoid repetitive back motions.  Id.

4      On November 21, 2008, Dr. Chau submitted a progress report with the same basic information

5  related to the plaintiff's subjective complaints.  (Doc. 10-14 at 19)  He noted that he had referred the

6  plaintiff to Dr. Chen for an evaluation and sought "Specific corrective adjustments to the spine to allow

7  heating within intervertebral segments normal range of motion.  Treatment includes corrective spinal

8  adjustments to the lumbar spine as well as physiotherapy in the form of muscle stimulation, myofascial

9  muscle release and intersegmental traction 2x per mo."  Id.  Again, on January 21, 2009, Dr. Chau

10  reported the same subjective complaints and sought authorization for chiropractic care twice per month

11  for three months and a referral to Dr. Chen for pain medication.  (Doc. 10-14 at 18.)

12      Dr. Fariba Vesali saw the plaintiff on June 26, 2012 for a comprehensive internal medicine

13  evaluation.  (Doc. 10-12 at 14-17)  The plaintiff reported that he has low back pain and that

14  chiropractic care made some improvement as did the epidural injections.  Id. at 14.  However, he rated

15  his pain as a seven on a scale of ten.  Id.  He reported that standing, sitting or walking for more than 20

16  minutes increased his pain.  Id.  Lying flat and taking Advil relieved the pain.  Id.

17      The doctor observed the plaintiff was in no acute distress and that he untied, removed and

18  replaced his shoes and got on and off the exam table without difficulty.  (Doc. 10-12 at 15)  In addition,

19  he had a normal gait; however, the doctor noted he had pain and tenderness in the lumbar spine.  Id.

20  The doctor opined that the plaintiff could sit, stand and walk for six hours in an eight hour day.  Id. at

21  16.  He could lift 50 pounds occasionally and 25 pounds occasionally.  Id. at 17.  Dr. Vesali anticipated

22  that these limitations would exist for 12 continuous months.  Id. at 16.

23      On June 30, 2012, the plaintiff underwent a comprehensive psychiatric examination with

24  psychologist, Aimee Riffel.  (Doc. 10-12 at 20-25) The plaintiff appeared "mildly dysphoric" and he

25  reported he "stays in bed due to pain and depression."  Id. at 23.  He reported he difficulty bending,

26  standing, stooping, lifting, and reaching but reported he was able to dress, bathe, travel, keep

27  appointments and manage his own funds without assistance. Id. at 24.  The plaintiff reported "chronic

28  use of marijuana beginning sometime in his early teens the last time being approximately two days ago

. . . He does report that he utilizes cannabis primarily for pain management and that his use may be intermittent." Id. at 22.  Dr. Riffel noted that "Mr. Ragasa is not currently taking any prescribed treatment for management of his conditions nor is he involved in any individual psychotherapy services to address the factors which may impact his overall condition." Id. at 24.  Dr. Riffel opined that "Mental Health factors alone would not likely interfere with his ability to complete a normal workday." Id.  She reported, that the plaintiff was "capable of completing simple and repetitive tasks and would not need additional supervision in the work environment . . . he would not have difficulty with complex tasks . . . [and] would not have difficulty dealing with overall stress within the work environment." Id. at 25.

On July 7, 2012, the plaintiff went to the emergency room complaining of his ears being "plugged" for three weeks.  (Doc. 10-12 at 43)  He complained also of "lower back pain, radiate to left leg, constant, unprovoked, sudden onset, 6/10 pain, nothing has improved discomfort, nothing has been tried." Id.  Again, on August 18, 2012, he went to the emergency room and reported that he was suffering "Low back pain that started last night. Denies trauma. Reports history of chronic back [pain]." Id. at 54.  He reported that "This is a recurrent problem.  The current episode started yesterday.  The problem occurs continuously.  The problem has been gradually worsening.  Associated with chronic disc disease . . . Pain location: lumbar with raqdiation [sic] to the left foot. The pain is similar to prior episodes.  The pain is severe.  Nothing relieves the symptoms.  The symptoms are aggravated by activity." Id. at 54-55.  He had "limited lateral flexion and extension (10 degrees) forward and back.  With limited lateral flexion as well 10 degrees both sides." Id. at 56.  He was discharged with medication.  Id.

On September 14, 2012, the plaintiff again visited the emergency room with the nearly same complaints as in his prior visit.  (Doc. 10-12 at 61-64)  The doctor provided him medication.  Id. at 63.  This occurred again on October 31, 2012.  Id. at 66-73.

On February 26, 2014, the plaintiff saw Dr. Juan Carlos Galvez Vargas and complained of back pain.  (Doc. 10-15 at 51-53)  Dr. Vargas referred the plaintiff to physical therapy.  Id. at 52.

On July 24, 2012, Dr. J. Mitchell performed a consultative evaluation.  (Doc. 10-4 at 70-76) Dr. Mitchell found the plaintiff inconsistently described his back pain on his right, then on his left and then

back to his right.  Id. at 72.  He noted that that though surgery was recommended, the plaintiff failed to follow through.  Id.  Likewise, Dr. Mitchell noted that the plaintiff sometimes reported that Advil addressed the pain and then other times denied that it did.  Id.  He found the plaintiff could occasionally lift and/or carry 50 pounds occasionally and 25 pounds frequently.  Id. at 75.  He could stand, sit or walk six hours in an eight hour day.  Id.  He could frequently climb stairs, balance, stoop, kneel, crouch and crawl.  Id. at 75-76.  Dr. C. DelaRosa also conducted a consultative evaluation on March 18, 2013 and come to the same conclusions as Dr. Mitchell.  Id. at 61-65.

**B.      Administrative Hearing Testimony**

Plaintiff testified at the administrative hearing on June 24, 2014.  (Doc. 10-3 at 32.)  Plaintiff reported that he completed the twelfth grade.  Id. at 35.  He then testified that his alleged disability began on June 5, 2006, however, he worked for a period of time as a caretaker for his sister in 2009 and early 2010.  Id. at 36-37.  Plaintiff reported that he could not continue caring for his sister because he was unable stay on his feet long enough to provide adequate care.  Id. at 37.

Before Plaintiff stopped working, he was a car salesperson with Modesto Mazda.  (Doc. 10-3 at 37.)  He also confirmed that he was a salesperson at Sexton or Tradeway Chevrolet, Capital Dodge, Turlock Auto Plaza, Hatchets Ford, and Smith Chevrolet.  Id. at 37-38.  Plaintiff testified that he could no longer work because of the pain and his inability to stand longer than fifteen to twenty minutes.  Id. at 38.  Additionally, he had difficulty getting in and out of a vehicle and could no longer receive his share of customers, because it was a competitive setting in which workers had to beat each other to customers.  Id. at 39.  He reported that the pain started in his lower back and then would shoot down to his buttocks and his leg.  Id. at 39-40.

The plaintiff asserted that he had pain every day and normally he rated it as a seven on a scale of ten.  (Doc. 10-3 at 40.)  He testified that he was unable to bend to pick things up and would have to crouch to do so.  Id. at 41.  The plaintiff asserted that he would sometimes have difficulty reaching overhead and was unable to sit in a position for longer than twenty to thirty minutes without fidgeting or walking around.  Id. at 39, 40, 48.  The plaintiff stated he is unable to stand for longer than fifteen to twenty minutes, lift more than ten to fifteen pounds, or lift his arms above his head.  Id. at 48.  Additionally, he testified he could not walk longer than twenty to thirty minutes and used a cane fifty

1 percent of the time. Id. at 47-48. He said he experienced difficulty sleeping through the night,

2 because his most intense pain occurred during the night. Id. at 43-44.

3 He testified that he spent a lot of the day sleeping and watching television. (Doc. 10-3 at 46.)

4 He was most comfortable lying flat on his back and believed that he spent half of the time between

5 eight a.m. and five p.m. in this position. Id. at 49. The plaintiff asserted that though he felt depressed,

6 he did not take medication for it. Id. at 46, 56. Instead he coped with the depression by sleeping and

7 attempting to make the time pass faster. Id. at 56.

8 The plaintiff testified he did not have surgery on his back, despite Dr. Bybee's

9 recommendation, because he spoke "to many, many people who went ahead and had surgery, I –I

10 thought it would be best for me to pursue other treatments, like, you know, chiropractic, physical

11 therapy. I've had steroid injections in my spine."[1] He believed surgery would not fully alleviate the

12 pain and thought the procedure would result in his back being more hunched. (Doc. 10-3 at 51.)

13 Next, the vocational expert ("VE") testified. He described the plaintiff's most recent work as

14 home attendant, *DOT*[2] 354.377-014 and explained that this work was classified at the medium exertion

15 level and was semi-skilled with a SVP of 3. (Doc. 10-3 at 58.) The VE noted the work was performed

16 at the heavy exertion level by the plaintiff. Id. The VE classified the plaintiff's previous work as an

17 automobiles salesperson, *DOT* 273.353-010, stating that that this work was "light and skilled with a

18 SVP of 6. (*Id.*)

19 The ALJ asked the VE to consider "a hypothetical individual with the claimant's age and

20 education and with the past jobs... just described." (Doc. 10-3 at 58.) This individual was also limited

21 to performing medium work and had the ability to stoop, crouch, and crawl frequently. Id. The VE

22 opined this hypothetical individual could perform work as an automobiles salesperson and a home

23 attendant, but he could not perform the work as a home attendant in the same way the plaintiff

24 performed it. Id.

25

26 [1] Of course, by the time Dr. Whitmore referred the plaintiff to Dr. Bybee for a surgical evaluation, the plaintiff had already undergone six months of conservative treatment—including the epidural injections.

27 [2] *The Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

The ALJ posed a second hypothetical individual who, along with the restrictions posed in the first hypothetical, also was limited to performing light work and could stoop, crouch, and crawl only occasionally.  (Doc. 10-3 at 58.)  The VE believed this individual could perform the work as an automobiles salesperson but not as a home attendant.  Id. at 59.  For the third hypothetical, the ALJ asked the VE to consider the same individual as in the previous hypothetical but this time the individual was limited to sedentary work.  (Doc. 10-3 at 59.)  The VE stated that this individual could not perform Plaintiff's past work, but could perform unskilled, sedentary work.  Id.

Next, the ALJ requested the VE consider the same individual with the added limitations of no lifting from the floor, no overhead lifting, and lifting a maximum of seven pounds.  (Doc. 10-3 at 59.)  The VE believed this individual could still perform the world of unskilled, sedentary work.  Id. at 60.  Finally, the ALJ asked the VE to consider the same individual as in hypothetical three, but to consider that the worker would need to change positions every twenty minutes.  (Doc. 10-3 at 60.)  The VE opined this individual could not perform any work.  Id.

Plaintiff's attorney then asked the VE to consider the same individual as in hypothetical three but added that the worker would need four additional breaks of ten to fifteen minutes to lie down.  (Doc. 10-3 at 61.)  The VE opined that the person would not be able to work.  Id.

## C.    The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the application date of June 5, 2006. (Doc. 10-3 at 14.)  At step two, the ALJ found Plaintiff's severe impairments included degenerative disc disease and obesity.  Id. At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing criteria.  Id. at 19.  Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently.  He could sit 6 hours, stand and/or walk 6 hours in an 8-hour workday.  This capacity most closely approximates light work as defing in 20 CFR 404.1567(b) and 416.967(b) except he can only occasionally stoop, crouch, kneel or crawl.

Id.  Based upon this RFC, the ALJ concluded "the claimant is limited to light work" (Id. at 19) and capable of performing past work as an Auto Salesperson."  Id. at 22.   As a result, the ALJ found

Plaintiff was not disabled as defined by the Social Security Act. Id.

**DISCUSSION AND ANALYSIS**

In this action, the plaintiff complains that the ALJ failed to properly consider the medical assessment rating evaluation conducted in relation to his workers compensation case.  (Doc. 15 at 5) He argues "the ALJ failed to articulate a legally sufficient rationale to reject the ignored portions."  Id.

**A.     The ALJ properly considered the assessment conducted in the workers compensation case**

In her findings, the ALJ noted that,

A September 2007 work assessment from his Worker's Compensation case indicates a capacity for sedentary to light exertion with occasional postural activities (Exhibit 8F, pp. 8-9).  While this report is based on thorough testing, the undersigned notes it excludes secondary screening by a vocational expert as indicated by the test results and testing protocol (Exhibit 8F, pp. 3-4, 11).  In addition, this study was performed early in the Worker's Compensation case and subsequent medical evidence suggests significant improvement from these findings.  Thus, the study is incomplete and does not consider the beneficial effects of treatment.  Furthermore, the conclusions are not consistent with the record as a whole.  Therefore, the undersigned accords only partial weight to this assessment.

(Doc. 10-3 at 19) The plaintiff argues that this is insufficient because the VE testified at the hearing about a hypothetical which incorporated the limitations identified in the Employability Study.  (Doc. 15 at 7) Thus, he argues, to the extent there was a deficiency in the report, it was cured at the time of the hearing before the ALJ. Id.  In addition, the plaintiff argues that the ALJ's conclusion that the testing described in the Employability Study was not consistent with the record as a whole was insufficient.  Id.  He argues the ALJ had the obligation of identifying specific portions of the medical record as which she believed the study was inconsistent. Id.

On the other hand, as noted by the respondent, the Employability Study and the testing upon which it was based was not performed by a physician but by a chiropractor.  (Doc. 17 at 6-7)  Medical sources are divided into two categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. Section 404.1513(a) provides, "We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s)."  Chiropractors are not acceptable medical sources but are considered "other sources." 20 CFR § 404.1513(d)(1). Their opinions may be considered "to show the severity of your impairment(s) and how it affects your

1    ability to work." <u>Id</u>.

2        In general, "other sources" are not afforded the same deference as opinions offered by

3 acceptable medical sources and need not be rejected with the same specificity. <u>Amezquita v. Colvin</u>,

4 2016 WL 1715163, at \*2 (C.D. Cal. Apr. 28, 2016); <u>Garcia v. Astrue</u>, 2011 WL 3875483, \*12 (E.D.

5 Cal. Sept. 1, 2011).  Instead, the ALJ must articulate only a "germane reason" for discounting the

6 other source information. See <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005); See <u>Bain v.

7 Astrue</u>, 319 F. App'x 543, 547 (9th Cir. 2009) ("Because Stout is not an acceptable medical source, the

8 ALJ had only to provide 'germane' reasons for discrediting her opinion.") (citing <u>Dodrill v. Shalala</u>,

9 12 F.3d 915, 919 (9th Cir.1993)); <u>Kus v. Astrue</u>, 276 Fed. Appx. 555, 556 (9th Cir.2008) ( "As with

10 other witnesses, the ALJ was required to take into account evidence from Kus' chiropractor 'unless he

11 or she expressly determine[d] to disregard such testimony' and gave reasons for doing so.")

12 (modification in original) (citing <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir.2001))

13        As noted above, the ALJ gave "partial weight" to the Employability Study.  (Doc. 10-3 at 19)

14 This was due, in part, to the fact that the study was conducted in September 2007—about seven years

15 before the hearing—and changes in the plaintiff's condition occurred afterward including the

16 "perceptible relief" Dr. Yang noted in 2008. (Doc. 10-12 at 8-11, 22-25)  These were sufficient

17 reasons for not fully accepting the report.

18        Notably, the ALJ took a similar approach with the results of the consultative exams.  (Doc. 10-

19 3 at 20)  Both Dr. Mitchell and Dr. DelaRosa placed certain limitations on the plaintiff's work

20 abilities.  <u>Id</u>. at 16.  However, the ALJ afforded "only partial weight to these opinions as new evidence

21 received at the hearing level supports greater limitations."  <u>Id</u>.  The ALJ did the same related to the

22 opinion of Dr. Vesali.  <u>Id</u>. at 19.

23        In addition, though the plaintiff argues that the questions posed to the VE by the ALJ satisfied

24 the need for additional "further assessment by a Vocational Expert," the record does not support that

25 conclusion and, instead, is mere speculation by the plaintiff.  (Doc. 10-10 at 51)   Moreover, there is no

26 showing that the VE's testimony sufficed for purposes of the "Level II screening" the chiropractor felt

27 was needed.  <u>Id</u>.   Thus, the Court agrees with the ALJ that the Employability Study was preliminary

28 only and not complete. Consequently, the Court does not find that the ALJ erred in assigning the

Employability Study only partial weight.

## CONCLUSION AND ORDER

As discussed above, the ALJ applied the proper legal standards in evaluating the employability study prepared by the plaintiff's chiropractor. Therefore, the conclusion that Plaintiff is not disabled as defined by the Social Security Act must be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

   1. The decision of the Commissioner of Social Security is **AFFIRMED**; and

   2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Francis J. Ragasa.

IT IS SO ORDERED.

Dated: __September 1, 2016__    _____/s/ Jennifer L. Thurston__
                UNITED STATES MAGISTRATE JUDGE